# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

CRYSTAL DRAGONITE,

        Plaintiff,

v.

                             **MEMORANDUM OF LAW**
                             Civil File No. 17-3785 (MJD/SER)

SOUTH LAKE CLINIC, P.A.,
d/b/a South Lake Pediatric Clinic,

        Defendant.

Sheila A. Engelmeier and Thomas E. Marshall, Engelmeier & Umanah, Counsel for Plaintiff.

Alec J. Beck, Ford & Harrison LLP, Counsel for Defendant.

## I.      INTRODUCTION

This matter is before the Court on Defendant's Motion for Summary Judgment.  [Docket No. 36]  The Court heard oral argument on June 12, 2019.  On September 30, 2019, the Court issued an Order granting Defendant's motion and stating that a Memorandum of Law would follow.  [Docket No. 57]  In accordance with that Order, the Court now issues the following Memorandum of Law.

1

## II.    BACKGROUND

### A.    Factual Background

#### 1.    Parties

Plaintiff Crystal Dragonite is the mother of and primary caregiver to four minor children, three of whom have serious mental health issues.  (Marshall Decl., Ex. A, Dragonite Dep. 26-27; Dragonite Decl. ¶ 6.)

Defendant South Lake Clinic, P.A., doing business as South Lake Pediatric Clinic ("South Lake") is a pediatrics practice located in the Twin Cities' suburbs with 6 clinics.  (See, e.g., Beck Aff., Ex. 1.)

Charlotte Rupp was the Health Information Management ("HIM") supervisor.  (Marshall Decl., Ex. B, Rupp. Dep. 11-12.)  Marcine Jablonski was the Director of Business Systems.  (Marshall Decl., Ex. C, Jablonski Dep. 12.)  Heidi Northrup was the Clinic Administrator.  (Marshall Decl., Ex. D, Northrup Dep. 7-8.)  Stephanie Leach was the Human Resources Manager.  (Marshall Decl., Ex. E, Leach Dep. 10.)

#### 2.    Hiring

In June 2010, South Lake hired Dragonite as a scheduler in the Scheduling and Medical Records department, located at South Lake's Minnetonka clinic. (Dragonite Dep. 53; Dragonite Decl. ¶ 3; Dragonite Decl., Ex. A.)  She was hired

by Rupp, who was Dragonite's supervisor throughout her employment.

(Dragonite Dep. 53.)

### 3. South Lake's Family and Medical Leave Act ("FMLA") Policy

When Plaintiff began her employment, South Lake's 2009 Employee

Handbook was in place. (Beck Aff., Ex. 5, 2009 Handbook.) It stated:

> If your need for serious health condition and/or injured
> servicemember FMLA leave is foreseeable, you must make a
> reasonable effort to schedule medical treatment so as not to disrupt
> unduly South Lake Pediatrics' operations. You must also fill out an
> Application for FMLA leave at least 30 days before the time you
> intend to start your leave, or as soon as is practicable.

(2009 Handbook at 28.)

### 4. Overview of Dragonite's Use of FMLA Leave

When Dragonite was hired, she had three children. (Dragonite Dep. 54.)

In 2010, Dragonite did not need to take leave for her children's medical issues as

much as she would need to later in her employment. (Id. 54-55, 79-80, 106.)

Over time, beginning in the fall of 2010, she began requesting more time off to

care for her children's health needs. (Id. 55-56.) Dragonite never exceeded her

FMLA leave limit. (Id. 23.)

Over the course of Dragonite's employment with Defendant, she made and was granted approximately 100 requests for FMLA leave; many of the requests were for intermittent leave and covered more than one absence, totaling hundreds of leaves. (Beck Aff., Ex. 4.) Dragonite testified that she was occasionally asked to reschedule a medical appointment because of staffing issues but also that she was able to cover all of her needs for leave. (Dragonite Dep. 107-08.) Dragonite points to no request for leave that was turned down because of insufficient notice.

According to Dragonite, South Lake erred in designating some of her leave requests, such as for an IEP issue, as FMLA leave rather than leave under the Minnesota School Activity and Conference Leave Act. (See Marshall Decl., Ex. D, Northrup Dep., Exs. 86-87; Dragonite Dep. 127 (testifying that Rupp told Dragonite that she did not know whether certain requests fell under the FMLA or the School Leave Act, so Rupp directed Dragonite to submit the requests as FMLA leave and let human resources figure it out); Dragonite Decl., Ex. L.) Dragonite testified that she was never denied a leave because of confusion between FMLA and School leave. (Dragonite Dep. 128.)

### 5. May 2, 2011 Written Warning

Beginning early in Dragonite's employment, she was consistently warned about her interpersonal issues with coworkers and supervisors, while also receiving positive reviews for her work ethic and technical skills.

South Lake gave Dragonite her first written warning on May 2, 2011 for "Unacceptable Behavior."  (Beck Aff., Ex. 2.)  The warning stated that Rupp and Dragonite had "had a couple verbal discussions about unacceptable behavior in the work place.  I am once again addressing the issues in writing this time."  (Id.) It stated that Dragonite had been "Invading other staff's privacy," "Being disrespectful," "Intimidating your co-workers," and "Overstepping your boundaries," and provided examples of each type of behavior.  (Id.)  It noted that the "behavior must stop immediately" and that the next steps "may include . . . verbal warnings, written warnings, suspension, or termination."  (Id.)  The warning was signed by Dragonite and Rupp.  (Id.)  Dragonite testified that she was aware that her coworkers found her "intimidating" based on their "physical response to [her] approaching them."  (Dragonite Dep. 72-73.)  She disagreed with the warning, but "underst[oo]d where [her supervisor] was coming from" regarding interpreting her actions as overstepping boundaries and acknowledged that "it is possible that people viewed me that way."  (Id. 75, 77.)

### 6. First FMLA Request

In June of 2011, Plaintiff made her first FMLA leave request, asking for intermittent FMLA leave to care for one of her sons. (Dragonite Decl., Ex. D.) The request was approved. (Id.) In January 2012, she requested and was granted intermittent FMLA leave for another son. (Dragonite Decl., Ex. E.) In October 2012, she recertified the intermittent FMLA leave requests for both sons. (Dragonite Decl., Ex. F.)

### 7. Overview of Dragonite's Job Performance

Throughout Dragonite's employment at South Lake, her performance reviews praised her work ethic and skills, but also consistently mentioned her "unacceptable behavior in the work place" with regard to interactions with coworkers or supervisors. (See Dragonite Dep., Exs. 7-8, January 8, 2014 Review (rating Dragonite "Good" or "Superior" in all categories, directing Dragonite on "[w]orking side by side with fellow coworkers . . . without showing frustration" and "[f]inding a way to approach the Supervisor without interrupting her workload" and including comment by Dragonite "Sometimes I can be ove[r]bearing"); Dragonite Dep., Ex. 9, January 21, 2015 Self Review (rating herself as Fair to Superior in all categories but noting "I try to take the lead and

do everything" and listing goals including "Better team player" and "Attitude /frustration"); Marshall Decl., Ex. B, Rupp Dep., Ex. 11, August 26, 2010 90 Day Review (stating that "[o]verall" she was doing "a great job"); Rupp Dep., Ex. 14, June 21, 2011 Review (noting that Dragonite was "a good employee with strong work ethics," and that she was "improving" with regard to "unacceptable behavior in the work place"); Rupp Dep., Ex. 25, June 13, 2012 Review (commending Dragonite for her leadership, dependability, loyalty, and communication with supervisors, but noting that Rupp was "still see[ing] some issues with taking leadership from your co-workers when they are in charge"); Rupp Dep., Ex. 51, 2015 Annual Review (praising Dragonite's skills, work ethic, initiative, and problem-solving; opining that she was "Much improved" on working with coworkers without showing frustration and approaching her supervisor without interrupting her workload and directing her to "Maintain a more positive attitude" and "Work[] more closely as a team player by not taking the lead all the time").)

### 8.    April 12, 2012 Written Warning

On April 12, 2012, Plaintiff received a written warning for "Unacceptable Behavior." (Beck Aff., Ex. 3.) The warning stated that Dragonite was "still

having issues" with the behavior mentioned in the 2011 warning and continued

that there were also "additional issues that need to improve," namely "Harsh

and snotty comments out loud about your co-workers" and "Trust issues with

co-workers." (Id.) The warning noted that Dragonite's "co-workers are

frustrated that you are making all the decisions or telling the staff what they

should be doing during the day instead of working together as a team player."

(Id.) It stated that the "behavior must stop," and warned that "[s]ince we have

spoke[n] about this in the past and again today, the next step will be termination

from South Lake Pediatrics." (Id.) The warning was signed by Rupp and

Dragonite. (Id.)

### 9.     May 2012 Email Exchange

On May 31, 2012, Dragonite and Ginny Polson had an email exchange in

which Dragonite asked why her pay stub showed that she had used a certain

amount of PTO when she had actually taken FMLA leave and only a half hour of

PTO. (Rupp Dep., Ex. 23.) Polson responded that she used that amount of PTO

to make 40 hours for the week for Dragonite because she had not seen a time off

slip showing FMLA leave but offered to reverse the PTO on Dragonite's check.

(Id.) Dragonite responded "That would be great. It was FMLA for my son's

appt with LM. I can show you the yellow slip if you need?" (Id.) Polson

forwarded the exchange to Rupp with the message "FYI," and Rupp responded

"Amazing – isn't it?" (Id.) Polson responded to Rupp: "That's not exactly the

word I was thinking ̇O ̈" (Id.)

### 10. Super User

In 2012, South Lake designated Dragonite as a "Super User" with regard to

the new electronic medical records system within her department based on her

ability to adapt to the new system. (Marshall Decl., Ex. C, Jablonski Dep 72.) As

a Super User, she served as a resource to answer questions for coworkers on the

operation of the new system. (Dragonite Dep. 170.)

### 11. 2013 Promotion

In January 2013, South Lake's medical records were reorganized to become

fully digital, and South Lake promoted Dragonite to a medical records position

in the new Health Information Management Department ("HIM"). (Rupp Dep.,

Exs. 29-30; Dragonite Dep. 91; Dragonite Decl. ¶ 5; Dragonite Decl., Ex. B.) Rupp

remained Dragonite's supervisor. (Dragonite Dep. 91-92.)

### 12. Birth of Fourth Child

In April 2013, Dragonite had her fourth child. (Dragonite Decl. ¶ 12; Rupp Dep., Ex. 32.) In October 2013, she recertified intermittent FMLA leave for her children's health care needs, and in November 2013, she submitted an additional request for intermittent FMLA leave for the care of her daughter, which was approved that month. (Dragonite Decl., Ex. H; Dragonite Dep. 117, 119.)

On October 16, 2013, Rupp emailed Polson and Tina Thorson to inform them: "[Dragonite] will be out of the office today and tomorrow. Ginny please use PTO (no FMLA). Thanks." (Rupp Dep., Ex. 37.) Thorson replied: "☐ " (Id.)

In December 2013, Dragonite's son's health needs required that she set up and attend monthly appointments. (Dragonite Decl. ¶ 16.) In January 2014, she had to take leave for multiple emergencies involving her children. (Dragonite Dep. 125.)

On April 11, 2014, Jablonski and Renee Hengemuhle from human resources met with Dragonite to review her hours, discuss her scheduling of appointments, and discuss and review her FMLA leave. (Rupp Dep., Exs. 41-44; Rupp Dep. 118.) Hengemuhle told Dragonite that, in the future, when "major things happened," she should let human resources know so that human resources could "be prepared for it," because they "need[ed] to know that [she]

[was] going to be taking more time off." (Dragonite Dep. 136-37.) Hengemuhle

also suggested that Dragonite change to part-time employment so that she

would not have to take leave to care for her children's health needs. (Dragonite

Dep. 138-39; Rupp Dep. 121.)

### 13. May 2014 Policy Changes

In June 2014, a revised Employee Handbook was put in place. (Beck Aff.,

Ex. 1, 2014 Handbook.) The June 2014 Employee Handbook contained a few

changes related to FMLA leave. The parties agree that 2014 Handbook required

that intermittent leave be certified by a medical provider every six months. It

included a requirement that PTO be taken in one-hour increments and stated

that there would be not PTO or unpaid time off during the blackout period of

mid-August through early September, unless specifically approved by the clinic

administrator. (2014 Handbook at 47-48.) However, Dragonite admitted that the

one-hour increment requirement was not applied to her, and she was permitted

to use FMLA leave in smaller increments. (Dragonite Dep. 157.) She also

admitted that the blackout period had always been in place and that her FMLA

leave requests were approved during the blackout period. (Id. 147-48.)

### 14.  January 2015 Email

On January 22, 2015, Rupp sent an email to Polson stating: "I was looking at the PTO slip and have a question about [Dragonite's] FMLA leave – why is number going down ☐ ."  (Rupp Dep., Ex. 52.)  Polson responded: "We use a rolling back calendar method so anything she has used prior the last 26 pay periods falls off her total.  ☐    Just doesn't seem right, does it?"  (Id.)

### 15.  February 2015

In February 2015, several coworker complaints about Dragonite were documented by Rupp.  (Rupp Dep. 154; Rupp Dep., Ex. 54, Feb. 24, 2015 Email from Rupp to Jablonski ("Staff is getting frustrated with [Dragonite] again – how many times do we talk to her before we do anything and what can we do?"); Beck Aff., Ex. 10 (noting staff complaints about Dragonite including "Never stays put in her chair;" "Gossip;" and "Over powering again by telling the staff what they need to do").)

### 16.  April 2015 Discipline

During April 2015, Dragonite requested recertification of her intermittent FMLA.  (Dragonite Decl., Ex. K.)  On April 8, 2015, Plaintiff contacted Stephanie

Leach about renewing the FMLA leave for her children.  (Marshall Decl., Ex. E, Leach Dep. 52.)

On Thursday, April 9, 2015, Dragonite's coworker, Jamilah Thomas, began complaining of headaches and dizziness.  (Dragonite Dep. 13; Rupp. Dep 187, Dragonite Decl. ¶¶ 30-31.)  Rupp was not in her office, so Dragonite went to the nurse's station for assistance.  (Rupp Dep. 182; Dragonite Decl. ¶ 31.)  One of the South Lake medical assistants took Thomas to an exam room.  (Dragonite Decl. ¶ 31.)  A South Lake pediatrician saw Thomas and did not want her to drive herself, so someone came and picked her up.  (Dragonite Decl. ¶ 31; Rupp 167, 172.)

On April 9, 2015, Leach wrote a draft email to Northrup that she did not send stating:

> [Dragonite] approached her (before I talked to [Dragonite]) about her 6 month FMLA update.  [Rupp] and [Dragonite] were under the impression that this is a renewal and we could deny her leave . . . and [Dragonite] stated that she would leave to find another job if we didn't renew her leave.  [Rupp] said "we're never going to be able to get rid of her. . ."

(Rupp Dep., Ex. 58.)  Leach testified that she did not remember the context in which Rupp made the statement, but admitted it could have been in response to Leach telling her that the 6-month recertification was just updating documents

and there was no decision to be made to approve or deny because the FMLA leave had already been previously approved.  (Leach Dep. 73-74.)

On Friday, the following workday, Thomas did not come into work because she was feeling worse and scheduled an appointment with her primary care doctor.  (Dragonite Decl. ¶ 32.)  Thomas returned to work at South Lake on Monday and thanked Dragonite for getting someone else involved because she was afraid to do it herself.  (Dragonite Decl. ¶ 32; Dragonite Dep., Ex. 2.)  Thomas complained to Rupp that she had not wanted Dragonite to take her to see a doctor because Thomas did not want to use her PTO, that she did not want to take off work, and that she did not feel it was "fair" because she had been required to use PTO.  (Rupp Dep. 167, 174.)

South Lake has a protocol for employee medical treatment, because the doctors and nurse practitioners at the clinics are specialists in pediatric medicine and some will not treat adults because they present issues outside the providers' training.  (See Rupp Dep. 175, 184; Northrup Dep. 30.)  The sick employee needs to go to her supervisor who then speaks to the floor supervisor.  (Rupp Dep. 175.)

> The policy states that you do not go directly to a physician to ask for care, because there are consent to treat forms, and insurance

information and part of the entire intake process that needs to
happen prior to care happening, as in any situation.

We are not an emergency department.  And [Dragonite] didn't
follow – she knows that she didn't follow protocol, because it's
written into the employee medical that if care is being sought, it goes
through a supervisor, who then follows their workflow to see if it's
appropriate for that person to be seen.

(Leach Dep. 68.)

The 2009 South Lake Employee Handbook Lake allows employees to see a

South Lake physician for a minor illness such as a sore throat.  (2009 Handbook

at 9.)  The Handbook requires that the employee must ask their immediate

supervisor to check with a provider to ask if the clinician is willing to see them;

then an appointment must be made with the receptionist and a registration form

completed; and the visit will be billed.  (<u>Id.</u>)  The Handbook provides that

"violation of this policy may result in disciplinary action, up to and including

unpaid suspension and/or immediate termination."  (<u>Id.</u> at 9-10.)  There is no

protocol for emergencies because South Lake is "a pediatric group and not

readily prepared to treat adults" and is "not an emergency department."  (Leach

Dep. 67, 68.)

Leach talked to Rupp about the incident; she did not speak to Dragonite,

Thomas, the medical assistant, or the doctor who saw Thomas.  (Leach Dep. 62,

66-67, 72; Leach Dep., Ex. 94.) No one other than Dragonite was disciplined for

the incident. (Rupp Dep. 184; Jablonski Dep. 59; Leach Dep. 69–71.) )

On April 14, 2015, South Lake gave Dragonite a warning for the Thomas

incident, which stated that Dragonite

> recognized a coworker was feeling ill and took it upon herself to
> contact the floor staff for medical care. [Dragonite] violated a
> number of protocols regarding employee health services and took
> action without consent from the ill co-worker or her supervisor.
> These actions were not only inappropriate for her position, but
> resulted in unnecessary use of PTO and medical expenses for the co-
> worker.

(Beck Aff., Ex. 11.)

In the "Employee Response" section, Dragonite wrote: "Coworker did

indicate upon returning that she was glad I had spoken w/a nurse as her

symptoms got worse." (Id.) The warning stated that the only disciplinary action

was a verbal warning, and its set forth expectations going forward "to act

professionally towards your supervisor and co-workers while on South Lake

Pediatrics property, to focus on your daily work, to follow the proper chain of

command when issues arise, and to avoid acting upon situations that are

appropriate for a supervisor to handle." (Id.) It noted: "Failure to demonstrate

immediate and sustained acceptable workplace behavior as outlined above or in

any other areas of job performance may result in further disciplinary action up to and including immediate termination." (Id.) Dragonite, Rupp, and Jablonski signed the warning. (Id.)

### 17. July 2015 FMLA Leave Requests

In early July 2015, Dragonite turned in her requests for intermittent FMLA leave for July and August 2015. (Rupp Dep., Ex. 68.) Although some of the leaves were during the blackout period, they were all approved by Rupp and Northrup. (Id.)

### 18. Termination

On July 29, 2015, one of Dragonite's coworkers pointed out that there was a delay in care because someone in the scheduling department was sending the HIM department information through the wrong area of the electronic system. (Rupp Dep. 212; Dragonite Dep. 188.) The coworker was not sure how to handle the situation, so Dragonite told her that she would go see if the person in the scheduling department making the mistake was available to talk. (Dragonite Dep. 188-89; Rupp Dep., Ex. 70.) It was near the end of the day, the other person in the department had gone home, her supervisor was on vacation, and the team lead had left for the day. (Dragonite Dep. 189; Rupp Dep., Ex. 70.) Dragonite

told Rupp what had happened. (Dragonite Dep. 189.) Rupp said she would take action and instructed Dragonite to return to work, so Dragonite then went back to her desk and finished the workday. (Dragonite Dep. 8-9, 189-90.) Shortly thereafter, at 4:58 p.m., Rupp sent an email to the lead in the scheduling department asking her to remind her staff to not make the mistake. (Rupp Dep., Ex. 70.)

At 10:25 p.m. that same night, Rupp wrote an email to Dragonite stating: "You will need to fill out a separate request for the dates within the black out and Heidi needs to approve it, however FMLA does fall different than a regular request. We can talk about this more in the morning." (Rupp Dep., Ex. 67.) (Rupp Dep. 217-18.)

On July 30, 2015, Dragonite arrived at South Lake at 8:30 a.m. after being on intermittent FMLA leave that morning. (Dragonite Dep. 191.) Rupp told her that she needed to fill out the requests for the leaves during the blackout period because they needed to be specifically approved by Northrup. (Id.) Dragonite returned the new forms at about 10:00 a.m. (Id.)

Later that day, at 12:47 p.m., Rupp received an email from the front office specialist (the supervisor in charge of scheduling and reception) regarding the scheduling department issue raised by Dragonite the night before stating:

> [Dragonite] actually came to talk to the girls last night about this. She told Brittany she was going to come talk to Sarah [lead in scheduling] and I today about it too . . . Whoever she talks to first, we can just let her know that you and I/Sarah have already talked about it ̔O

(Rupp Dep., Ex. 70.)

Rupp interpreted this email to mean that, after she had told Dragonite that she would take care of the problem and to go back to work, the next morning Dragonite had gone to talk about the problem with the scheduling department anyway. (Rupp Dep. 215.) Then, the front office specialist verbally told Rupp that, in fact, after Rupp had told Dragonite that she would take care of the issue and for Dragonite to return to her desk, Dragonite had, instead, returned to talk to the scheduling department about the issue. (Id. 215-16, 228-29.) Rupp and the front office specialist reported this incident and the fact that they kept having the same issue with Dragonite not following protocol and hierarchy to human resources. (Id. 229-30.) Leach, Rupp, and Northrup decided to terminate Dragonite for her continued failure to follow office protocols. (Id. 231.)

At 4:30 p.m., on July 30, 2015, Rupp and Leach told Dragonite to come to a conference room. (Dragonite Dep. 194.) They told her their version of the events that had occurred with regard to the scheduling department issue, and Dragonite argued that events had not occurred that way and explained what had happened. (Id.) Leach told her that her story did not match that of anyone else she had spoken with. (Id.) Dragonite got angry and raised her voice. (Id. 195-96.) Leach left and returned with Northrup. (Id. 197.) Dragonite explained her side of the story to Northrup, and Northrup responded that Dragonite "had a great set of skills but [] didn't understand how hierarchy worked," so she was terminated. (Id.) South Lake terminated Dragonite's employment. (Dragonite Dep., Ex. 1.) Rupp, Dragonite, and Leach all signed the termination letter, and Dragonite did not insert any comments in the "Employee Response" section. (Id.)

B. **Procedural History**

On July 27, 2017, Dragonite served a Complaint against South Lake for a lawsuit in Minnesota state court. On August 16, 2017, South Lake removed the matter to this Court. On October 25, 2017, Plaintiff filed an Amended Complaint against Defendant. The Amended Complaint alleges: Count 1: Violation of the Minnesota Human Rights Act – Reprisal Against Plaintiff Based on her

Association with Disabled Individuals; Count 2: Violation of the Minnesota

Human Rights Act – Discrimination Based on Familial Status; Count 3: Violation

of Minn. Stat. § 181.9412; and Count 4: Family Medical Leave Act Interference,

Denial and Restraint.  [Docket No. 22]  South Lake now moves for summary

judgment on all claims against it.

## III.    DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine dispute as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact.  Celotex, 477 U.S. at 323.  "A dispute is genuine if the evidence is

such that it could cause a reasonable jury to return a verdict for either party; a

fact is material if its resolution affects the outcome of the case."  Amini v. City of

Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).

### B.    FMLA Standard

The FMLA provides eligible employees up to 12 weeks of unpaid leave during any 12-month period if, among other things, they need to care for a son or daughter with a serious health condition. 29 U.S.C. § 2612(a)(1)(C).

> Two subsections of the statute establish prohibited acts. Section 2615(a)(1) makes it unlawful for an employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise" rights provided under the FMLA. The Act also makes it unlawful for "any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA. 29 U.S.C. § 2615(a)(2).

Pulczinski v. Trinity Structural Towers, Inc., 691 F.3d 996, 1005 (8th Cir. 2012).

The Eighth Circuit recognizes three types of claims arising under the two subsections. The first type of claim is an entitlement claim, which "occurs where an employer refuses to authorize leave under the FMLA or takes other action to avoid responsibilities under the Act." Id. The second type of claim is a retaliation claim, which occurs when "an employee opposes any practice made unlawful under the FMLA" and the employer "for that reason take[s] adverse action against the employee who is engaged in opposition." Id. at 1006. The third type of claim is a discrimination claim, which occurs "when an employer takes adverse action against an employee because the employee exercises rights to which he is entitled under the FMLA." Id.

## C.     FMLA Discrimination and Retaliation

When asserting a retaliation claim or discrimination claim, a plaintiff must show "proof of the employer's discriminatory intent."  Brown v. City of Jacksonville, 711 F.3d 883, 891 (8th Cir. 2013).  The claim can be proven under the direct evidence or McDonnell Douglas indirect evidence standard.  Id.

> Absent direct evidence, [Dragonite]'s FMLA retaliation [or discrimination] claims are evaluated under the McDonnell Douglas burden-shifting framework.  To establish a prima facie case, [Dragonite] must show that 1) [s]he engaged in protected conduct; 2) [s]he suffered a materially adverse employment action; and 3) the materially adverse action was causally linked to the protected conduct.  If [Dragonite] establishes a prima facie case, the burden shifts to [South Lake] to promulgate a non-discriminatory, legitimate justification for its conduct, and then back to [Dragonite] to either introduce evidence to rebut the employer's justification as a pretext for discrimination, or introduce additional evidence proving actual discrimination.

Chappell v. Bilco Co., 675 F.3d 1110, 1116-17 (8th Cir. 2012) (citations omitted).

Here, Plaintiff argues that her claim survives under both the direct and indirect method.  "[D]irect evidence is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action."  Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004) (citation omitted).  Direct evidence is evidence "of

conduct or statements by persons involved in the decision-making process, which indicate a discriminatory attitude was more likely than not a motivating factor in the employer's decision." Kratzer v. Rockwell Collins, Inc., 398 F.3d 1040, 1046 (8th Cir. 2005).

### 1. Direct Evidence

Plaintiff asserts that direct evidence supports her claim for FMLA discrimination and retaliation. The Court concludes that, taken together, the evidence by Plaintiff simply does not rise to the level of direct evidence sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action. See, e.g., Massey-Diez v. Univ. of Iowa Cmty. Med. Servs., Inc., 826 F.3d 1149, 1161 (8th Cir. 2016) ("Cases finding direct evidence of discrimination usually involve statements or actions more blatant than anything presented in this case.").

Plaintiff notes that Rupp testified that prioritizing Dragonite's leave requests over the leave requests of her coworkers was "unfair" to those coworkers; however, in context, Rupp further testified that she always granted Dragonite's leave requests and that Dragonite's leave requests were not held against her. (Rupp Dep. 111-12.) Rupp also testified that she never received

criticism from anyone within South Lake regarding Dragonite's absences, that she tried her "hardest to accommodate" Dragonite, and that she considered Dragonite to be a "good employee." (Rupp Dep. 68, 84, 94.)

Dragonite notes that, in May 2012, Rupp commented on an email exchange between Dragonite and a human resources employee regarding whether particular leave was PTO or FMLA by writing: "Amazing – isn't it?" This comment is ambiguous at best and, more importantly, was made more than three years before Dragonite was terminated and was made before she was promoted in 2013.

Dragonite further points out that, in a January 2015 email to human resources, Rupp used a sad face emoji when asking why Dragonite's FMLA leave was going down. The use of the emoji does not provide a specific link between the alleged discriminatory animus and the challenged decision or evidence of a discriminatory attitude.

Finally, Dragonite points to an April 2015 draft email that Leach wrote but never sent, in which she states that Rupp had said "we're never going to be able to get rid of [Dragonite]." Leach's recounting of Rupp's statement that they were "never going to be able to get rid of [Dragonite]" arose in the context of dealing

with Dragonite's misbehavior. (Rupp Dep., Ex. 58.) The email was dated the same day as the April 2015 incident with Thomas. (Northrup Dep. 54-56.) Also, the comment was made several months before Dragonite was terminated.

Dragonite also points to Hengemuhle's suggestion that she switch to a part-time schedule. Defendant's one-time suggestion of part-time work as part of an overall attempt to work with Dragonite to accommodate her schedule and Defendant's scheduling needs does not constitute direct evidence of animus.

The weak evidence of animus relied upon by Plaintiff is further diminished because there is uncontradicted, extensive evidence that Dragonite had ongoing, escalating boundary, protocol and interpersonal work issues, which was the reason she was terminated. She was consistently warned about boundaries, interpersonal interactions, and following hierarchy. Dragonite, herself, noted these issues in her own self evaluations and in her deposition. In the context of Dragonite's workplace misconduct and South Lake's accommodation of Dragonite's requests for hundreds of incidents of FMLA leave over more than five years, the evidence relied upon by Dragonite is insufficient to constitute direct evidence.

### 2. Indirect Evidence

#### a) Protected Conduct

The parties agree that Plaintiff engaged in protected conduct by requesting and taking FMLA leave.

#### b) Adverse Employment Act

South Lake admits that Dragonite was subject to an adverse employment action when she was terminated.

#### c) Causal Connection

Dragonite cannot establish a causal connection and, for the same reasons, cannot show pretext.

The first section of both versions of the Employee Handbook states:

> We believe teamwork is a critical element in efficient patient care. Positive, cooperative behavior among employees is the cornerstone of that teamwork. An atmosphere of helpfulness allows everyone to work more efficiently and enjoy his or her job.

(2009 Handbook at 5; 2014 Handbook at 6.) Throughout Dragonite's career with South Lake, she was repeatedly warned for violating this Standard of Conduct.

Misconduct is a legitimate, non-discriminatory reason for termination. <u>See</u> <u>Wierman v. Casey's General Stores</u>, 638 F.3d 984, 995 (8th Cir. 2011).

Dragonite's reliance on generally positive performance reviews does not

aid her case because, consistently, the performance reviews also noted that she

had problems regarding interactions with coworkers and following hierarchy

and boundaries.  She received documented discipline based on these issues

before she requested or took any FMLA leave and continued to receive warnings

about the same behavior throughout her employment.  She, herself, noted these

issues in her own self-evaluations.  She also testified that, based on coworkers'

body language when she approached them, she could tell that they were

intimidated by her.  This is in sharp contrast to the cases upon which Dragonite

relies, such as <u>Fisher v. Pharmacia & Upjohn</u>, 225 F.3d 915, 921 (8th Cir. 2000), in

which the employee consistently received positive reviews for the same

characteristic for which he was allegedly fired.

While Dragonite correctly points out that she was the only employee

involved in the Thomas incident who received a verbal warning, she points to no

evidence that any of the other employees involved had past persistent issues

with failing to follow workplace protocols and hierarchies.  Although Dragonite

disputes the fairness of the verbal warning for the Thomas incident, she does not

dispute that she took Thomas directly to a medical provider when the South

Lake policy 1) only covered employees seeking medical attention for minor ailments and 2) required an employee seeking medical attention to ask a supervisor to ask a medical provider if he or she was comfortable giving the treatment and then make an appointment and fill out forms for treatment and billing. The final incident that led to her termination is documented in the record and involves the same issue of failing to follow hierarchy and boundaries in the workplace.

Finally, Dragonite's reliance on temporal proximity fails because Dragonite was constantly recertifying, requesting, and being granted FMLA leave on a regular basis. The fact that she was terminated soon after requesting more intermittent FMLA leave that was no greater in quantity or frequency than the frequent FMLA leave that was a normal course of her employment is insufficient to raise a material question as to a causal connection.

### d) Legitimate, Nondiscriminatory Reason

There is no dispute that Defendant received many complaints about Dragonite and that she was viewed as a difficult coworker. There is no dispute that she received two "last chance" warnings and was told that she could be terminated. There is no dispute that Dragonite violated South Lake policy in

April 2015 when she took a coworker to see a medical provider at South Lake.

There is no dispute that she was warned after taking that action. In July 2015, it

was reported to Rupp that Dragonite had again circumvented her supervisor by

giving her coworker instructions on how to do her job. Defendant had a

legitimate, nondiscriminatory reason for firing Dragonite.

### e) Pretext

Dragonite cannot show pretext. There are no statements demonstrating

animus. There are no examples of South Lake treating a similarly situated

employee who did not take FMLA leave better than it treated Dragonite. Timing

alone does not establish pretext, particularly in the context of this case in which,

for many years, Dragonite was frequently recertifying, requesting, and being

granted FMLA leave.

From the beginning of Dragonite's employment with Defendant, she was

lauded for her technical skill and work ethic and consistently criticized for her

failure to follow reporting structures and her personal behavior. Her own self

reviews show that she was intimidating, overbearing, and difficult to get along

with. Cf. Bennis v. Minn. Hockey Ventures Group, LP, No. 12-CV-341 SRN/JSM,

2013 WL 3305213, at *14 (D. Minn. June 28, 2013) (noting that, although the

plaintiff had positive reviews regarding one aspect of his job (event work), he received consistent criticisms of his handling of another aspect of his job (non-event work) and holding that "Defendant was fair to criticize [the plaintiff's] non-event work, and [the plaintiff's] failure to improve his office performance was a legitimate, nondiscriminatory reason for his termination.").

### D.    FMLA Entitlement

"To succeed, [Plaintiff] must show that she was eligible for FMLA leave, that [Defendant] was on notice of her need for FMLA leave, and that the company denied her benefits to which she was entitled to under the FMLA." Hasenwinkel v. Mosaic, 809 F.3d 427, 432 (8th Cir. 2015) (citations omitted). "Termination in response to a qualifying employee's assertion of rights may qualify as interference."  Dollar v. Smithway Motor Xpress, Inc., 710 F.3d 798, 806 (8th Cir. 2013).

Dragonite was never denied FMLA leave; she requested and received hundreds of FMLA leaves during her employment.  See Collier-Sumrain v. Trane U.S., Inc., No. CIV. 12-2466 MJD/FLN, 2014 WL 1584487, at *13 (D. Minn. Apr. 21, 2014) (holding that defendant is entitled to summary judgment on FMLA interference claim when employee admitted that "she eventually received all FMLA leave she was entitled").  In order to prove an entitlement claim, a

plaintiff must prove that she was actually denied FMLA leave.  See Quinn v. St.

Louis County, 653 F.3d 745, 753 (8th Cir. 2011) ("[T]he employee must also show

that the employer denied the employee entitlements under the FMLA.").

Additionally, Plaintiff fails to identify any impermissible requirements that

South Lake imposed for FMLA leave that could have interfered with or

discouraged her ability to take FMLA leave.  The FMLA permits employers to

require recertification every 6 months.  See 29 C.F.R. § 825.308(b) (permitting

employers to require medical recertification of FMLA leave every six months).

Dragonite admitted that the 6-month recertification requirement was not a

problem and was within South Lake's rights.  (Dragonite Dep. 120-21.)

The fact that South Lake asked for 30 days' notice and sometimes asked

Dragonite to work around its schedule, while ultimately always granting a

rescheduled request (see Dragonite Dep. 19-20), is not a violation of the FMLA.

The FMLA explicitly provides:

> In any case in which the necessity for leave . . . is foreseeable based
> on planned medical treatment, the employee—
>
> (A) shall make a reasonable effort to schedule the treatment so as not
> to disrupt unduly the operations of the employer, subject to the
> approval of the health care provider . . . ; and

> (B) shall provide the employer with not less than 30 days' notice, before the date the leave is to begin, of the employee's intention to take leave under such subparagraph, except that if the date of the treatment requires leave to begin in less than 30 days, the employee shall provide such notice as is practicable.

29 U.S.C. § 2612(e)(2).  See also 29 C.F.R. § 825.203 ("If an employee needs leave intermittently or on a reduced leave schedule for planned medical treatment, then the employee must make a reasonable effort to schedule the treatment so as not to disrupt unduly the employer's operations."); Id. § 825.302(e)("When planning medical treatment, the employee must consult with the employer and make a reasonable effort to schedule the treatment so as not to disrupt unduly the employer's operations.").  Thus, South Lake's occasional requests that Dragonite "schedule h[er] [] medical appointments at a time that was least disruptive to [South Lake] was entirely appropriate under the FMLA and did not interfere with plaintiff's FMLA rights as a matter of law."  Stairwalt v. TIAA, No. 317CV00220MOCDSC, 2018 WL 3745833, at *3 (W.D.N.C. Aug. 7, 2018).

As for the blackout period, Dragonite admitted that it had always been in effect and that she was given FMLA leave during the blackout period. (Dragonite Dep. 147-49.)  There is no evidence that the blackout period ever affected her ability to take FMLA leave.

The only remaining basis for Dragonite's claim could be that South Lake fired her in order to prevent her from taking additional intermittent FMLA leave. As explained with regard to the discrimination and retaliation claims, Plaintiff has failed to raise a question of fact regarding whether she was terminated in response to her request for FMLA leave. Moreover, since there is no evidence that South Lake's policies discouraged Dragonite from taking FMLA, it had never denied a request, it had granted hundreds of leaves to Dragonite throughout her five-year employment, and the upcoming intermittent FMLA leaves were for minor amounts of time in relation to past requests, this claim is simply not plausible.

**E.     Minnesota Human Rights Act**

The Minnesota Human Rights Act ("MHRA") prohibits an employer from retaliating against an employee because that employee "associated with a person or group of persons who are disabled" and prohibits an employer from discharging an employee based on familial status, that is "the condition of one or more minors being domiciled with [] their parent." Minn. Stat. §§ 363A.03, subd. 18; 363A.08, subd. 2; 363A.15, subd. 2.

Dragonite asserts that South Lake fired her based on her familial status as a mother and in retaliation for associating with her three disabled children. The Court grants summary judgment on both claims.

There is no evidence that Defendant terminated Dragonite based on her familial status of having her minor children living in her home. Defendant knew that Dragonite had minor children throughout her employment. Plaintiff points to no evidence that childless employees were treated differently than she was.

Similarly, Dragonite's claim that she was fired based on her association on persons with disabilities – her three minor children – is unsupported. There is no evidence to indicate such a motivation for her termination. Additionally, Defendant was aware of her children's disabilities for many years before she was fired. See Erdman v. Nationwide Ins. Co., 582 F.3d 500, 511 (3d Cir. 2009) (affirming summary judgment on similar association claim when "the record is devoid of evidence indicating that [the employer's] decision to fire [the employee] was motivated by [her daughter's] disability[; and] [i]ndeed, [the employer] was aware of [her daughter's] disability for many years before [the employee] was fired").

F.      School Leave Act

The Minnesota School Conference and Activities Leave Act requires

employers to

> grant an employee leave of up to a total of 16 hours during any 12-month period to attend school conferences or school-related activities related to the employee's child, provided the conferences or school-related activities cannot be scheduled during nonwork hours.

Minn. Stat. § 181.9412, subd. 2.

> When the leave cannot be scheduled during nonwork hours and the need for the leave is foreseeable, the employee must provide reasonable prior notice of the leave and make a reasonable effort to schedule the leave so as not to disrupt unduly the operations of the employer.

Id. The employer does not need to provide paid leave, except that the employee

may substitute accrued vacation or other appropriate paid leave for leave under

the Act. Id., subd. 3.

South Lake includes a School Leave policy in its Handbook:

> Employees . . . may use up to sixteen (16) hours each twelve-month period to attend a child's school conferences, activities, or pre-school activities, if those conferences or activities cannot be scheduled outside the employee's work schedule. Employees may take this time unpaid or may use available PTO. The employee must give his/her supervisor reasonable notice of the upcoming absence and make a reasonable effort to schedule the time off so as not to disrupt work.

(2014 Handbook at 36.)

Dragonite argues that she requested School leave and often tried to reschedule events to accommodate South Lake's requests. However, when she was granted leave, South Lake sometimes mislabeled it as FMLA leave, reducing her available FMLA leave for serious medical issues.

The Court grants summary judgment on the School leave claim. Plaintiff admitted that she never went over her FMLA "bank," and thus, always had leave available. (Dragonite Dep. 123-24.) She also testified that she was never denied leave. Every time she requested a leave for any reason related to her children, she received it. South Lake's policies treat FMLA and School leave identically as far as the ability to take paid or unpaid time off. Thus, even if South Lake misclassified some of the School leave, there was no harm to Dragonite. Any alleged misclassification did not adversely impact her ability to take FMLA leave. She does not allege that she was ever denied leave that would have qualified under the School Leave Act. The classification of the leave as FMLA or School leave made no difference regarding whether she was paid. The alleged misclassification had no effect on Dragonite at all.

Because there is no genuine dispute as to any material fact as to any of

Plaintiff's claims, Defendant is entitled to summary judgment on all claims

against it.


Dated:   October 2, 2019                    s/ Michael J. Davis
                                            Michael J. Davis
                                            United States District Court